## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| D.K., an individual, | : | |
| | : | **Case No. 2:22-cv-3786** |
| Plaintiff, | : | |
| | : | **Chief Judge Algenon L. Marbley** |
| v. | : | |
| | : | **Magistrate Judge Elizabeth P. Deavers** |
| RED ROOF INNS, INC. AND RED ROOF | : | |
| FRANCHISING, LLC, | : | |
| | : | |
| Defendants. | : | |

### OPINION & ORDER

This matter is before this Court on Defendants', Red Roof Inns, Inc.'s and Red Roof Franchising, LLC's, Motion to Dismiss. (ECF No. 22). For the following reasons, Defendants' Motion to Dismiss is hereby **DENIED.**

### I. BACKGROUND

This case arises under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a). Plaintiff D.K. alleges she was trafficked for sex at the Seattle Red Roof Property ("RRP") in Seattle, Washington, a branded property of Red Roof Inns, Inc., and Red Roof Franchising, LLC (hereinafter together referred to as "Red Roof" or "Defendants") between 2014 and 2017. (ECF No. 1 ¶ 41). Plaintiff alleges Defendants "profited from each and every room that D.K.'s traffickers and customers rented where D.K. was harbored and maintained for the purpose of sex trafficking" and from Wi-Fi data collected from the rooms. (*Id.* ¶ 59). She also alleges that "to save costs and continually reap millions of dollars in profits, Red Roof generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties." (*Id.* ¶ 34).

Plaintiff alleges that the hotel staff at the Seattle RRP interacted with her repeatedly and would have been aware that she was bruised and abused. (*Id.* ¶ 47).  According to D.K., each stay at the Seattle RRP raised "several consistent red flags," that should have been obvious to staff, "including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes' Unusually large number of used condoms left in the trash; Unusually large numbers of male visitors coming in and out D.K.'s room and asking for D.K. and her trafficker at the front desk; Visible signs of prior/private physical abuse; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Loud noises of abuse or other emergency audible to staff or other guests; Living out of the hotels rooms; and Loitering and soliciting on hotel grounds (*Id.* ¶ 53). Plaintiff also asserts that her trafficker used the hotel's Wi-Fi to post advertisements for the sale of her body and communicate with "johns." (*Id.* ¶ 43).

Plaintiff now seeks to hold Defendants liable as a beneficiary of their participation in a commercial venture that they knew, or should have known, violated the TVPRA. Plaintiff commenced this action in October 2022 (ECF No. 1).  In June 2023, Defendants filed a Motion to Dismiss. (ECF No. 22). Plaintiff has responded, and Defendants replied. (ECF Nos. 31; 35). Therefore, the Motion is now ripe for review.

## II.  STANDARD OF REVIEW

This Court may dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F. 3d 950, 958–59 (6th Cir. 2005). This Court must

construe the complaint in the light most favorable to the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F. 3d 430, 434 (6th Cir. 2008). If more than one inference may be drawn from an allegation, this Court must resolve the conflict in favor of the plaintiff. *Mayer v. Mylod*, 988 F. 2d 635, 638 (6th Cir. 1993). This Court cannot dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id*. This Court, however, is not required to accept as true mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although liberal, Rule 12(b)(6) requires more than bare assertions of legal conclusions. *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). Generally, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It must contain "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. A claim is plausible when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Finally, the Complaint should be read as a whole, even if a specific alleged fact read in isolation appears meaningless. *Ricchio v. McLean*, 853 F.3d 553, 557 (1st Cir. 2017).

### III. LAW & ANALYSIS

#### A. Direct Civil Liability Under the TVPRA § 1595

This Court has undertaken extensive analysis of the issue of civil liability of hotel defendants in sex trafficking cases under the TVPRA in several cases with many factual similarities to this one. *See e.g., T.P. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-cv-04933,

2022 WL 17363234 (S.D. Ohio Dec. 1, 2022); *A.C. v. Red Roof, Inc.*, No. 2:19-cv-4965, 2020 WL 3256261 (S.D. Ohio Jun. 16, 2020); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:10-cv-1194, 2020 WL 1244192 (S.D. Ohio Mar. 16, 2020); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019); *H.H. v. G6 Hospitality, LLC*, No. 2:19-cv-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019).

The TVPRA has two provisions relevant to this case. First, the TVPRA provides for criminal penalties set forth in 18 U.S.C. § 1591:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Secondly, and central to Plaintiff's claim, is the standard for civil liability under the TVPRA set forth in 18 U.S.C. § 1595:

An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

As a preliminary matter, this Court has held in several cases that § 1595(a) can be a standalone claim, and civil defendants need not have committed the underlying criminal sex trafficking offense under § 1591. *M.A.*, 425 F. Supp. 3d at 964; *H.H.*, 2019 WL 6682152 at *2 (citing Cong. Research Serv., R40190, The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (P.L. 110-457): Criminal Law Provisions, at 16 (Jan. 29, 2009) (the amendments to the TVPRA "create[ ] civil liability both for those who face criminal liability for their profiteering and those who do not.")); *Plaintiff A v. Schair*, No. 2:11-cv-00145-WCO, 2014 WL 12495639, at *3 (N.D. Ga. Sept. 9, 2014) (the 2008 amendments broadened the parties who could be sued for trafficking violations from only the perpetrator)). This Court likewise finds that Plaintiff's allegation that she is a victim of trafficking under § 1591 is enough to plead sufficiently that she is "a victim of this chapter" pursuant to § 1595(a) in order to survive a motion to dismiss. (ECF No. 1 ¶¶ 21, 83).

This Court analyzes Plaintiff's direct civil liability claim under the "beneficiary theory" of § 1595(a). The plaintiff must plead the following in order to survive a Motion to Dismiss under this theory: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value"; (2) from participating in a venture; (3) that the "person knew or should have known has engaged in an act in violation of this chapter." § 1595(a). A plaintiff may satisfy these elements by showing that "defendant's own acts, omissions, and state of mind establish each element." *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1060 (D. Colo. 2021).

### 1. Knowing benefit

Plaintiff has sufficiently alleged that Defendants "knowingly benefited" financially from a venture in violation of the TVPRA. Plaintiff alleges that Red Roof profited from the trafficking in

two ways: (1) through renting rooms to Plaintiff's traffickers; and (2) "from gathering personal data from the Wi-Fi it provided to customers." (ECF No. 1 ¶ 27(d)).

As Defendants acknowledge, this Court found in *M.A.*, *H.H.*, and *T.P.* that "the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard." *M.A.*, 425 F. Supp. 3d at 965; *H.H.*, 2019 WL 6682152 at *2. *See also J.L.*, 521 F. Supp. 3d at 1061 (concluding that allegations that a hotel defendant received a percentage of room revenue where trafficking occurred, was sufficient to meet the knowingly benefited element under 18 U.S.C. § 1595(a)); *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1137 (D. Colo. 2019) (finding the forced labor provision of § 1589(b) does not "require[ ] the party to benefit from the [forced] labor or services for liability to attach"). Nonetheless, Defendants contend that mere receipt of room rental revenue is insufficient because: (1) there must be a causal relationship between the conduct and the receipt of the benefit; and (2) Defendants must have awareness of the trafficking.

Defendants argue that to plead a "knowing benefit," Plaintiff must show a "causal relationship between the affirmative conduct furthering the sex-trafficking venture and receipt of a benefit, with . . . constructive knowledge of that causal relationship." (ECF No. 22 at 15) (quoting *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019). This Court explained in *H.H.*, however, that "§ 1595(a) imposes no such requirement." 2019 WL 6682152, at *2. The statutory language simply "requires that Defendant knowingly benefit financially, not that the perpetrator compensate Defendant 'on account of' the sex trafficking venture." *Id.*

Nor must Plaintiff allege actual knowledge of the trafficking to allege that Defendants "knowingly benefitted." The statutory language of § 1595(a) "does not impose an actual

knowledge requirement," it just requires that Defendants knowingly received a financial benefit. *A.C.*, 2020 WL 3256261, at *4. Therefore, Plaintiff pleads allegations sufficient to meet this element of the § 1595(a) standard under a theory of benefit through room rental proceeds.

Plaintiff's contention that Defendants knowingly benefited from "gathering personal data" from Wi-Fi, however, fares worse. As Defendants point out, Plaintiff fails to allege that Defendants benefitted financially or received "anything of value" as is required by § 1595(a). (*See* ECF No. 22 at 16). Plaintiff makes no effort to explain how this data benefitted Defendants, either in her complaint or her Response to Defendants Motion to Dismiss. Accordingly, Plaintiff has failed to plead allegations sufficient to proceed under a theory of benefit through Wi-Fi data.

### 2. Participation in a venture

Plaintiff has also alleged sufficient facts to demonstrate Defendants' conduct constituted "participation in venture" under § 1595(a). This Court has held that participation in a venture under § 1595 does not require actual knowledge of trafficking crimes but requires "at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *M.A.*, 425 F. Supp. 3d at 970 (citing *Jean-Charles*, 937 F. Supp. 2d at 288–89); *see also G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023) (holding that "the relevant 'venture'" under Section 1595 need not be 'specifically a sex trafficking venture'" and can be a "'commercial venture[]' like running or expanding a business."); *Ricchio*, 853 F.3d at 555 (finding sufficient allegations that, among other things, the trafficker and hotel owner had prior dealings); *Doe S.W.*, 2020 WL 1244192, at *6–7 (finding allegations that defendant hotels repeatedly rented rooms to individuals they should have known were traffickers based on the

totality of the circumstances, were sufficient to survive a Rule 12(b)(6) motion); *H.H.*, 2019 WL 6682152, at *4 (same); *A.C.*, 2020 WL 3256261, at *6 (same). Further, participation in a venture under § 1595 does not require an "overt act." *See e.g., J.L.*, 521 F. Supp. 3d at 1062; *E.S. v. Best W. Int'l Inc.*, 510 F. Supp. 3d 420, 427 (N.D. Tex. 2021); *M.A.*, 425 F. Supp. 3d at 968–69; *S.J.*, 473 F. Supp. 3d at 153–54; *Doe S.W.*, 2020 WL 1244192, *6; *J.C. v. Choice Hotels Int'l, Inc.*, 2020 WL 3035794, at *1 n. 1 (N.D. Cal. June 5, 2020).

Plaintiff asserts that because Red Roof "owns, supervises, manages, controls, and/or operates" the Red Roof property at which she was trafficked, it therefore had a continuous business relationship with the franchisee who rented her traffickers rooms there. (ECF No. 1 ¶ 27). Plaintiff alleges that Defendants exerted this control over the property through myriad means including providing reservation platforms, providing training to employees, providing customer review platforms, and implementing standardized rules of operation. (*Id.* ¶ 73).

Defendants counter that the hotels are subject to franchise agreements and are owned and operated by third parties removed from Defendants' control. (ECF Nos. 22 at 9-13; 35 at 6-9). They argue that Plaintiff fails to connect Defendants to a venture that violated § 1591(a) beyond the existence of the franchisor-franchisee relationship. Additionally, Defendants argue that neither their ordinary business dealings—receiving room royalties and providing Wi-Fi—nor a failure to prevent sex trafficking can constitute "participation." (ECF Nos. 22 at 9-13; 35 at 6-9).

First, this Court addresses whether a franchisor-franchisee relationship between Defendants and the hotel operators is too attenuated to support Plaintiff's claim. Defendants point to the Eleventh Circuit's decision, *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021), which this Court has analyzed several times before. *See e.g., T.P.*, 2022 WL 17363234, at *10-

11.  In *Doe #1*, the complaint included allegations that: (1) defendants licensed their brand to franchisees who paid royalties to the defendants and other fees based on a percentage of their room revenue; (2) defendants received a percentage of the revenue generated from the rooms in which trafficking occurred; (3) defendants "owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms" at these hotels; (4) defendant franchisors investigated incidents of trafficking at the individual hotels and controlled training related to spotting trafficking; and (5) read online reviews mentioning prostitution and crime occurring generally at the hotels where plaintiffs were trafficked.  *Id.* at 726.  On these facts—admittedly similar to the ones *sub judice*—the Eleventh Circuit concluded that plaintiffs failed to allege that "the franchisors participated in a common undertaking involving risk or profit that violated the TVPRA."  *Id.* at 726–27.

But "[k]ey to the court's reasoning" in *Doe #1* "was how the plaintiffs had chosen to define the alleged venture—specifically as a '*sex trafficking*' venture."  *G.G.*, 76 F.4th at 561-62 (emphasis added).  Here, Plaintiff alleges that Defendants were engaged in "commercial business ventures" at the property where Plaintiff was trafficked, not that Defendants participated in the sex trafficking. (ECF No. 1 ¶ 27(d)).  This critical distinction limits *Doe #1*'s relevance here.  *See G.G.*, 76 F.4th at 562.

In a similar vein, Defendants' argument that they cannot be liable for participating in "ordinary business dealings" is unavailing.  As discussed above, the alleged venture "need not be 'specifically a sex trafficking venture.'"  *G.G.*, 76 F.4th at 554.  Instead, it can "be a business whose primary focus is not on sex trafficking."  *Id.*  In *G.G.*, for example, plaintiffs alleged that the defendant, Salesforce, provided advice and software to Backpage, a now-defunct website that

hosted advertisements posted by the minor plaintiff's street-level trafficker. *Id.* at 548. The Seventh Circuit concluded that the venture there "was Backpage's business itself, including the 'growth,' 'expansion,' and profitability of that business." *Id.* at 554. Salesforce's relationship with Backpage certainly fell within the ambit of its "ordinary business activities," much like Defendants'.

Defendants' argument that they at most observed trafficking, as opposed to participating in it, is similarly unpersuasive. They complain that Plaintiff is seeking to impose on them an affirmative duty to seek out and prevent trafficking. (ECF No. 22 at 12-13). As Plaintiff points out, though, she does not allege mere observation coupled with a failure to intervene. This is not an attempt at bystander liability. Instead, she alleges that the Defendants "violated the duty established by the TVPRA: to refrain from 'knowingly benefit[ing] from 'participation in a venture' that Red Roof knew or should have known violated § 1591." (ECF No. 31 at 22). Here, Plaintiff alleges that Defendants: (1) profited from the rooms her traffickers rented and failed to implement trafficking prevention training programs; (2) collected room reservation, identification, payment, and sex trafficking website data from the trafficker's use of hotel Wi-Fi; and (3) had expansive control over franchisee policies and operations but did not use that power to hold the franchisees accountable. (ECF No. 1 ¶¶ 56-81).

This Court finds that Plaintiff's allegations that Defendants profited, failed to implement policies, and maintained expansive control over the hotel operation standards meet § 1595's definition of "participation in a venture." Here, Defendant was involved in a business venture with the franchisee hotels, and both groups benefitted by renting rooms to traffickers despite having at least constructive knowledge of ongoing trafficking based on the totality of the circumstances.

Of note, Plaintiff incorrectly argued in her response that Defendants' actions meet § 1591(e)(4)'s definition of "participation in a venture." In *M.A.*, this Court not only ruled that the definition of "participation in a venture" from § 1591(e)(4) was not applicable to § 1595 because it would inappropriately import a knowledge standard absent in § 1595.[1]

### 3. Knew or should have known the venture violated the TVPRA

A defendant cannot be liable under 18 U.S.C. § 1595(a) unless it "knew or should have known" that the venture from which it benefitted was "engaged in an act in violation of the TVPRA." Defendants need not have actual knowledge of trafficking crimes for liability to attach, as the language of § 1595(a) demonstrates that constructive knowledge is sufficient. *M.A.*, 425 F. Supp. 3d at 970 (citing *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 288–89 (D. Conn. 2013)). This Court has previously held that notice of "the prevalence of sex trafficking generally at their hotels," the failure "to take adequate steps to train staff in order to prevent its occurrence," and signs that "should have alerted staff to [Plaintiff's] situation" are sufficient to meet the constructive knowledge requirement. *M.A.*, 425 F. Supp. 3d at 968. Seeing similar allegations in the case at hand, this Court reaches the same conclusion.

Plaintiff does not allege that Defendants had actual knowledge, but only constructive knowledge. She contends: (1) that there were signs of Plaintiff's trafficking that ought to have been obvious to hotel staff; and (2) that Defendants, and the hospitality industry more broadly, have long been aware of the prevalence of human trafficking at their properties but (3) failed to take action regarding human trafficking.

---

[1] In that case, plaintiff's counsel, who also represents Plaintiff in this case, argued as much. While this oversight is not detrimental to Plaintiff's allegations, Plaintiff's Counsel is again reminded to review this Court's past rulings as they represent this Court's interpretation of the TVPRA.

In response, Defendants raise three issues: (1) that Plaintiff fails to connect several of the "red flags" described in her complaint to her personal experience; (2) that Plaintiff fails to connect the "red flags" that do relate to her personally to the franchisor Defendants, as opposed to their franchisees; and (3) that a generalized awareness of sex trafficking in hotels is insufficient to hold Defendants liable. (ECF No. 22 at 13-15).

As a threshold matter, Defendant is incorrect that Plaintiff fails to connect her allegations regarding pays for stays in cash, paying for extended stays on a day-by-day basis, and an unusual number of male visitors, among other things, to her personally. In fact, Plaintiff alleges specifically that each stay at the Defendants' property included an "[u]nusually large number of male visitors going in and out of D.K.'s room." (ECF No. 1 ¶ 53). Similarly, Plaintiff alleged that Red Roof's employees witnessed condoms in the trash and loud yelling and fighting related to her trafficking. (*Id.* ¶¶ 53, 61). Plaintiff alleges she was regularly seen by the same staff, who would have seen signs that she was being beaten until she bruised. (*Id.* ¶ 47). Particularly when taking all inferences in favor of Plaintiff at this stage, this Court has little trouble concluding that Plaintiff sufficiently pleads that these issues were part of her personal experience, not just general allegations.

Having concluded that Plaintiff has sufficiently tied the "red flags" that she alleges to her own experience, this Court is guided in its analysis of the sufficiency of those "red flags" by two cases that establish the spectrum on which civil liability under the TVPRA can be found. In *Ricchio v. McLean*, the plaintiff alleged that the hotel owner and the trafficker were working together in a sex trafficking scheme evidenced by a "high-five" while discussing "getting this thing going again," a past business relationship between the two, and allegations that one of the hotel

owners had gone to the victim's room and "had shown indifference to [plaintiff's] obvious physical deterioration." *Ricchio*, 853 F. 3d at 555. Plaintiff alleged that while "in plain daylight view of the front office of the motel," her trafficker "kick[ed] her and force[d] her back toward the rented quarters when she had tried to escape." *Id.* The Court concluded that the defendants "acted, at least, in reckless disregard" of the nature of the venture for purposes of § 1589 and § 1595. *Id.* at 557. Conversely, in *Lawson v. Rubin*, plaintiffs sued Blue Icarus, the owner of a condo that it leased to Howard Rubin who was procuring women who he then sexually assaulted and abused at that location. No. 1:17-cv-6404 (BMC), 2018 WL 2012869, at *2 (E.D.N.Y. Apr. 29, 2018). The court found the plaintiff's allegations of one police visit after a fight ensued and one ambulance sent to the residence in six years insufficient to hold Blue Icarus liable under § 1595. The Court reasoned that even if Blue Icarus had done further investigation following the incidents, it would not have uncovered any more information about the alleged trafficking. *Lawson*, 2018 WL 2012869, at *13–14.

Plaintiff's allegations fall somewhere between the fact patterns in *Ricchio* and *Lawson*. This Court has previously concluded that many aspects of Plaintiff's experience described above should have alerted staff to her trafficking, including excessive condoms, repeated encounters with Plaintiff over the course of which she was visibly deteriorating, cash payments from her traffickers, and frequent male guests. *See M.A.*, 425 F. Supp. 3d at 967; *see also T.P.*, 2022 WL 17363234, at *8-9.

Defendants next argue that the individual hotel employees' actual or constructive knowledge of trafficking is insufficient to impute constructive knowledge on Defendants as franchisors. (ECF No. 22 at 14-15). But Plaintiff also alleges that Defendants *themselves* were on

13

notice about the prevalence of sex trafficking at their hotels and failed to take steps to train staff

to prevent its occurrence.  In comparable environments, courts have found failure to implement

policies sufficient to combat a known problem in one's operations constitutes willful blindness or

negligence. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758–79 (1998) (holding where

a "supervisor's sexual harassment is outside the scope of employment because the conduct was for

personal motives," an employer can still "be liable . . . where its own negligence is a cause of the

harassment" because it "knew or should have known about the conduct and failed to stop it");

*Brown v. Corr. Corp. of Am.*, 603 F. Supp. 2d 73, 81 (D.D.C. Mar. 26, 2009) (finding that

complaint stated sufficient allegations under § 1983, based on willful blindness, where defendants

knew that a supervisor at a correctional facility raped his employee, sexual harassment at the

facility "was not an isolated incident," and defendants failed "to implement and effectuate the

appropriate policies . . . to remedy and/or prevent the discriminatory conduct, sexual abuse and

sexual harassment and rape").

 The facts specific to Plaintiff's own sex trafficking, in combination with her allegations

that Defendant franchisors were on notice about the prevalence of sex trafficking at their hotels

yet continued to rent rooms to traffickers and failed to take adequate steps to train staff in order to

prevent its occurrence, together support a conclusion that Defendants had constructive knowledge

of the trafficking occurring at their hotels because they "should have known" about the nature of

the venture under the beneficiary theory's negligence standard.  18 U.S.C. § 1595.  Therefore, this

Court finds that Plaintiff's allegations are sufficient to meet the negligence standard in § 1595 for

purposes of surviving this Motions to Dismiss.

Because Plaintiff's allegations meet the three-pronged requirement of 18 U.S.C. § 1595, Plaintiff has sufficiently stated a claim that Defendants are directly, civilly liable under the TVPRA. *See M.A.* 425 F. Supp. 3d at 971–72 (denying motion to dismiss of hotel parent company defendants where plaintiff pled that defendants controlled employee training, room pricing, provided online booking platform, and conducted inspections).

### B. Joint and Several Liability

Plaintiff argues that all Defendants are jointly and severally liable for her damages under the TVPRA. (ECF No. 1 ¶ 38). Defendants do not appear to respond to this argument. Therefore, this Court will consider Defendants to have conceded this point.

### C. Vicarious Liability

A plaintiff can also satisfy the elements of § 1595's beneficiary theory by imputing "to the defendant the acts, omissions, and state of mind of an agent of the defendant" through indirect or vicarious liability. *J.L.*, 521 F. Supp. 3d at 1060. The TVPRA, however, does not address the issue of indirect or vicarious liability; therefore, federal district courts that have adjudicated this issue must apply common law to fill in the gaps. *Norfolk Redevelopment and Hous. Auth. v. Chesapeake and Potomac Tel. Co. of Va.*, 464 U.S. 30, 35–36 (1983) (explaining that the traditional rules of statutory construction advise that statutes are presumed not to disturb the common law "unless the language of the statute [is] clear and explicit for this purpose."); *see also In re Nicole Gas Prod., Ltd.*, 581 B.R. 843, 850 (B.A.P. 6th Cir. 2018), *aff'd sub nom., Nicole Gas Prod., Ltd.*, 916 F.3d 566 (6th Cir. 2019) (explaining that statutes are presumed to embrace the common law extant at their enactment). In the past, this Court, and other district courts, have applied the state common law of vicarious liability when addressing indirect liability arguments under the TVPRA. *M.A.*,

425 F. Supp. 3d at 971 (applying Ohio agency law); *see also A.B.*, 455 F. Supp. 3d at 194–95 (applying Pennsylvania agency law); *S.J.*, 473 F. Supp. 3d at 158–59 (applying New York agency law). Since this Court's ruling in 2019, another district court chose to apply the federal common law of vicarious liability in a TVPRA case. *A.B.*, 484 F. Supp. 3d at 939–40 (citing Ninth Circuit cases where the court applied the federal common law of agency when the federal statute did not otherwise provide direction).

As this Court has previously outlined, the Sixth Circuit has yet to rule on whether the federal or state common law of vicarious liability should be applied under the TVPRA. While this Court has previously entertained arguments for both given the nearly identical analysis required under federal and Ohio common law, this Court will proceed under a federal common law analysis of the issue. This approach brings the analysis in line with the Sixth Circuit's approach to applying the federal common law of vicarious liability to federal statutes that do not expressly provide direction on vicarious liability arguments. *See e.g., Marr v. Rife*, 503 F.2d 735, 740–41 (6th Cir. 1974) (explaining that in determining the extent of liability of the owner of a real estate agency for violations of Fair Housing Act by his agent, court should apply federal law and should not be restricted by respondeat superior law or law of vicarious liability of the various states); *Keating v. Peterson's Nelnet, LLC*, 615 Fed. App'x 365, 371–72 (6th Cir. 2015) (citing *In the Matter of Dish Network, LLC*, 28 FCC Rcd. 6574, 6584 (May 9, 2013)) (explaining that the FCC concluded that defendants may be held vicariously liable for statutory violations under federal common law agency principles, including apparent authority and ratification) *but cf. Pension Benefit Guar. Corp. v. Findlay Indus., Inc., et al.*, 902 F.3d 597, 611 (6th Cir. 2018) (deciding to apply state common law to an ERISA contract dispute regarding successor liability because a federal court

may take direction from "the law of the state in which it sits" so long as the standard used "best comports with the interests served by ERISA's regulatory scheme," but explaining that "as a general matter, the court must look to the federal common law and should draw guidance from state common law only when federal common law does not provide an established standard").

### 1. Agency

The Sixth Circuit relies on the Restatement of Agency when applying the federal common law of vicarious liability. *Johansen v. HomeAdvisor, Inc.*, 218 F.Supp.3d 577, 586 (S.D. Ohio 2016). Agency is most commonly defined as the "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency* § 1.01 (2006). A defining element of agency "is the principal's right to control the agent's actions" such as "[t]he power to give interim instructions." *Id.* at cmt. f (1); *see also Savanna Group, Inc. v. Trynex, Inc.*, No. 10-C-7995, 2013 WL 4734004, at *5 (N.D. Ill. Sept. 3, 2012) (explaining that "[t]he power to give interim instruction" is an element that "distinguishes principals in agency relationship from those who contract to receive services provided by persons who are not agents."). As a result of that power, "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." *Burlington Indus. Inc.*, 524 U.S. at 755–56 (1998) (quoting *Restatement (Second) of Agency* § 219(1) (1957)).

While the mere existence of a franchise does not establish an agency relationship, the franchise model also does not preclude wholesale franchisors from vicarious liability under an agency theory. *Bricker*, 804 F.Supp.2d at 623 ("[T]he existence of a franchisor-franchisee

relationship between persons does not in itself *preclude* the existence of a principal-agent relationship between them."). To determine whether "a principal-agent relationship exists, courts consider the same factors 'as in the absence of a franchisor-franchisee relationship.'" *Id.* (citing *Taylor v. Checkrite, Ltd.*, 627 F. Supp. 415, 416 (S.D. Ohio 1986)).  To succeed under an agency theory, Plaintiff must show both: (1) that Defendants and their franchisees were in an agency relationship; and (2) that hotels or hotel staff are plausibly liable under § 1595(a).

Plaintiff alleges that Defendants exercised day-to-day control over the Red Roof franchise property at issue here. (ECF No. 1 ¶¶ 67-81). Plaintiff argues that this includes requiring franchisees to, among other things: (1) use Red Roof's property management system; (2) use Red Roof's centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through Red Roof's centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with Red Roof's salary schedules; (7) comply with Red Roof's regulated room rental rates; (8) sharing profits; and (9) adhering to other brand standards. (*Id.* ¶ 73). These allegations are sufficient to meet the pleading standards of Federal Rule of Civil Procedure 8 to demonstrate Defendants' control over the franchisee properties for purposes of an agency relationship and vicarious liability.

Defendants also argue that the Complaint lacks allegations sufficient to support a claim that the franchisee violated the TVPRA, such that their actions can be imputed to their franchisors. (ECF No. 22 at 19-23).  Defendants are correct that for an agency theory of vicarious liability to apply to Defendants, the hotel franchisees themselves must have committed a wrong to be imputed on Defendants.  *See J.L. v. Best W. Int'l Inc.*, 521 F. Supp. 3d 1048, 1064-65 (D. Colo. 2021). Accordingly, this Court applies the three-pronged test established by 18 U.S.C. § 1595 and already

18

used to assess Defendants' direct liability to the hotel franchisees as well: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value"; (2) from participating in a venture; (3) that the "person knew or should have known has engaged in an act in violation of this chapter." § 1595(a).

First, Plaintiff alleges that the franchisees rented rooms to traffickers and financially benefited from their trafficking ventures, therefore satisfying the first prong. (ECF No. 1 ¶ 27(d)). Second, Plaintiff has alleged sufficient facts—that franchisee hotels, along with Defendants, benefited financially from renting rooms to traffickers and should have known trafficking was going on based on the totality of the circumstances—to meet § 1595's definition of "participation in a venture" in a commercial setting that profited from Plaintiff's sex trafficking. (ECF No. 1 ¶¶ 39-55). Third, Plaintiff alleged sufficient facts to demonstrate that employees at the hotel had constructive knowledge that she was being trafficked; specifically, that staff would have seen many red flags pointing toward trafficking and signs of Plaintiff's physical deterioration and abuse. (*Id.*).

### 2.  *Joint Employer Status*

Plaintiff argues in her Response that she alleges a second independent theory of vicarious liability through "joint employment" of hotel staff.  Much like agency theory, whether two employers are a joint employer also often turns on how much control one exercises over the other. *See e.g.*, *Int'l Longshoremen's Ass'n, AFL-CIO, Local Union No. 1937 v. Norfolk Southern Corp.*, 927 F.2d 900, 902 (6th Cir. 1991) (articulating test for joint employer status under the NLRA as "the interrelation of operations between the companies, common management, centralized control of labor relations, and common ownership."); *Sanford v. Main Street Baptist Church Manor, Inc.*,

327 Fed. App'x 587, 594 (6th Cir. 2009) (adopting the following test for Title VII joint employer status: "(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work place; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations.").

While Plaintiff neglects to use the specific words "joint employer" in her Complaint, she does allege that "Red Roof employees work throughout the Seattle RRI by Red Roof." (ECF No. 1 ¶ 27(b)). Whether Plaintiff's joint employer theory succeeds is a very close call. "While the factors this Court must consider when analyzing both agency and joint employer theories of vicarious liability are very similar, important among those to establish a joint employer theory of vicarious liability is the control exercised by the franchisor specific to employment policies." *B.D.G.*, 2023 WL 5935646, at *10. Ultimately, because Plaintiff does allege that Defendants have control over several key employment-related policies like training and setting rates of pay, she has sufficiently pleaded a joint employer theory. *See A.R.*, 2022 WL 17741054, at *11 (finding joint employer theory of vicarious liability sufficiently pleaded in nearly identical TVPRA litigation where Plaintiff pled that Wyndham promulgated "policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay.").

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is hereby **DENIED.**

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  March 28, 2024**